**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | NO. 09-612 |
| | : | |
| MICHAEL MATTHEWS | : | |

**MEMORANDUM**

PRATTER, J.                                                                                                               JULY 1, 2010

**I.     INTRODUCTION**

There can be a fine line between good police work and improper overzealousness when a suspect is apprehended before the conclusion of alleged criminal activity. In this case, the police stopped, and eventually arrested, Michael Matthews while he was allegedly in the initial stages of attempting to rob a check cashing store and, in the process, recovered a .22 caliber handgun, duct tape, and black gloves from Mr. Matthews' backpack. The Government contends this was good police work, while Mr. Matthews argues that he was the target of overzealous law enforcement activity.

Mr. Matthews is charged with one count of conspiracy to commit robbery which interfered with interstate commerce, in violation of 18 U.S.C. § 1951; two counts of attempted robbery which interfered with interstate commerce, in violation of 18 U.S.C. § 1951; one count of carrying and using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and, finally, one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

Mr. Matthews filed a Motion to Suppress all Physical Evidence recovered from him during his arrest on June 12, 2009. The Court received evidence during a suppression hearing on

March 26, 2010, and, after the parties filed supplemental briefs, additional evidence on June 15, 2010, regarding the Philadelphia Police Department's policies and procedures attendant to handling materials in the possession of arrestees. For the reasons discussed below, Mr. Matthews' Motion to Suppress is denied.

## II.    FACTUAL BACKGROUND

This case stems from a 9-1-1 call Philadelphia Police Officer Michael Frisco received from an employee at a check cashing store located at 5300 Tabor Road in Philadelphia. The employee, Ms. Karima Nance, told Officer Frisco that two black males dressed in female Muslim garb appeared to be loitering outside the store for the past two days at or near the opening time for the store. (Hrg. 3/26 N.T. at 98.) Ms. Nance stated that the men drove a gold four-door car. (Hrg. 3/26 N.T. at 99; 117.) Ms. Nance showed police officers video surveillance film from outside of the check cashing store which depicted a parked, gold-colored vehicle, and a person dressed head to toe in a traditional Muslim burka with a covered face carrying a tote bag. (See Hrg. 3/26 N.T. at 99.)

The police subsequently decided to conduct surveillance of the check cashing store. Officer James Storm was assigned to conduct undercover surveillance of the store in the morning hours just before opening. (Hrg. 3/26 N.T. at 8; 101.) Officer Storm is an experienced surveillance officer who has spent ten years working on the burglary detail surveillance team. (Hrg. 3/26 N.T. at 5-6.) To design the surveillance plan, Officer Storm spoke to Officer Frisco and reviewed his accounts of Ms. Nance's complaint. (Hrg. 3/26 N.T. at 9-12.)

While conducting surveillance, on June 12, 2009, at around 8:30 a.m., Officer Storm saw

a gold car immediately outside of the check cashing store. He believed the car matched the vehicle described by Ms. Nance. (Hrg. 3/26 N.T. at 19.) Officer Storm saw Mr. Matthews walking away from the passenger side of the car. (Hrg. 3/26 N.T. at 21.) Although Officer Storm did not see Mr. Matthews actually get out of the car, Officer Storm testified that based on the surrounding circumstances, he believed that Mr. Matthews "came from [the] vehicle." (Hrg. 3/26 N.T. at 23-24; 79-80.) When observed by Officer Storm, Mr. Matthews was carrying a backpack and kept looking back at Michael Anderson, who was sitting in the driver's seat of the car. (Hrg. 3/26 N.T. at 21-22; 50.) Mr. Anderson was talking on a cell phone and, in turn, was "looking behind out the rear window of the vehicle" toward Mr. Matthews. (Hrg. 3/26 N.T. at 22; 24.)

Office Storm saw Mr. Anderson "inch [his car] forward a little bit, stop, look back, talk, turn back around, move up further, stop, look back, start talking again . . . ." (Hrg. 3/26 N.T. at 24; 90; 92.) Officer Storm stated that he believed that Mr. Anderson and Mr. Matthews were communicating with each other because there was "no one else around . . . they are both talking, both looking directly at each other." (Hrg. 3/26 N.T. at 24-25.) Officer Storm also noticed that the license plate on the car was crooked, and after running a search on the license plate, he learned that it was an "unregistered stolen tag." (Hrg. 3/26 N.T. at 25; 27; 57.)

Mr. Matthews walked to a nearby bus stop on the corner of the street, but he did not appear to be looking in the direction of an oncoming bus. (Hrg. 3/26 N.T. at 85-6.) Rather, the Officer saw that Mr. Matthews was focused on the gold car and Mr. Anderson. (Hrg. 3/26 N.T. at 81; 85; 87; 92.) Mr. Matthews would walk, then stop, and then look back at Mr. Anderson. (Hrg. 3/26 N.T. at 92.)

While still under surveillance, Mr. Anderson got out of the car without locking the door,

crossed the street, and hid behind a tree. (Hrg. 3/26 N.T. at 27-28; 58; see also Ex. 7, transcript of police radio transmission ("[L]ooks like he's either hiding behind a tree. He might be involved in that . . . check cashing place . . . .").) The officers on site then decided to arrest Mr. Anderson.

After officers arrested Mr. Anderson, Officer Storm directed Officer Frisco and Officer Joanne Pomeroy, who had arrived at the scene, to stop Mr. Matthews. (Hrg. 3/26 N.T. at 29; 64; 103; 134; see also Ex. 7 ("There might be another guy on the corner with a hat on and a green and tan jacket. Might be involved with him.").) Officer Storm based that directive on:

> the constant body language between them two.
> There is no other people around. It's them two.
> Looking right at each other. Both mouths moving,
> Mr. Anderson talking on the phone, Mr. Matthews'
> lips going, looking directly at each other. Like I
> said, there was just us two sitting in the car
> watching this whole thing.

(Hrg. 3/26 N.T. at 79; see also Ex. 7 ("These the guys you're looking for . . . right? Yeah. . . . We're just trying to stop this before it happens if it's them. . . . We're going to get them for investigation. Gonna check out this gold car that looks exactly like the one that was on the video tape.").)

When Officers Frisco and Pomeroy approached Mr. Matthews, he was carrying a backpack. (Hrg. 3/26 N.T. at 104; 124; 135.) Officer Frisco asked Mr. Matthews to take the backpack off (which Mr. Matthews did) and then he "conducted a pat down of [Matthews'] outer clothing for [officer] safety." (Hrg. 3/26 N.T. at 105.) Officer Frisco asked Mr. Matthews for identification, which he provided. (Hrg. 3/26 N.T. at 106; 135.) In short order, the officers learned that Mr. Matthews had two active warrants for his arrest, one for theft of services, and four scofflaw tickets. (Hrg. 3/26 N.T. at 107-08; 126; 135; 141; see also Exs. 8a, 8b; Ex. 7 ("I got

4

him in here for two bench warrants. One for theft of services. And four tickets scofflaw.").)

Officer Frisco then handcuffed Mr. Matthews, walked him across the street, placed him in the back of a police car, and closed the door. (Hrg. 3/26 N.T. at 108-09; 127; 141.) Officer Pomeroy carried the backpack across the street, stood next to the police car, and immediately opened it in Mr. Matthews' presence. (Hrg. 3/26 N.T. at 109; 136; 142.) Inside the backpack was a .22 caliber handgun, gloves and duct tape. (Hrg. 3/26 N.T. at 110; 136-37; Exs. 5c, 5d.) Officer Frisco listed the contents of the backpack on a Property Receipt. (Hrg. 3/26 N.T. at 110-11; Exs. 6a, 6b.) In addition, one cellular telephone with a blue tooth device was recovered from Mr. Matthews' person upon his arrest and was also listed on a Property Receipt. (Hrg. 3/26 N.T. at 129.)

Officer Pomeroy testified that she opened Mr. Matthews' backpack in his presence pursuant to the policy outlined in Philadelphia Police Department Memorandum 99-14, instituted October 19, 1999, and still in effect today. Officer Pomeroy testified that, under this policy, because she had no reason to believe that Mr. Matthews' backpack contained contraband or evidence, she opened it on the scene of the arrest of Mr. Matthews without first obtaining a warrant. (See Hrg. 6/15 N.T. at 26; 30.) Officer Pomeroy also testified that when an arrestee like Mr. Matthews arrives at the cell block, the cell block attendant always inventories an arrestee's personal property. (See Hrg. 6/15 N.T. at 14.)

Philadelphia Police Lieutenant Francis Healy, special counsel to the Police Commissioner, also testified at the suppression hearing regarding the police department's inventory procedures. Lt. Healy testified that when an arresting officer takes personal property like a bag that the officer does not believe contains contraband, the bag should be opened and

inventoried pursuant to Memorandum 99-14 before it is brought to the station house. (Hrg. 6/15 N.T. at 37-8.) He explained that this inventory search is done to keep officers safe by preventing the transportation of any hazardous materials to the police station and to protect the officers from litigation arising from allegations that an arrestee's property was stolen or damaged. (Hrg. 6/15 N.T. at 37-8.) Lt. Healy further testified that if Officer Pomeroy had not opened Mr. Matthews' backpack at the scene of the arrest, the backpack would have been opened and inventoried by the cell block attendant. (Hrg. 6/15 N.T. at 43.)

**III.　DISCUSSION**

Mr. Matthews moves to suppress from trial all physical evidence recovered from him after his arrest, because, he argues, this evidence was discovered during the course of a search that violated his rights under the Fourth Amendment. Mr. Matthews contends that the evidence is "fruit of the poisonous tree," derived from an investigatory stop that was illegal because the police lacked knowledge of reasonable, articulable facts indicating that Mr. Matthews was engaged in criminal activity. Mr. Matthews also argues that even assuming the initial stop was lawful, the evidence found in his backpack should still be suppressed because the warrantless search of his backpack was neither a valid search incident to arrest nor a valid inventory search.

On a motion to suppress, the burden of proof is initially on the movant who seeks suppression of the evidence. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once the movant has established a basis for his motion, the burden shifts - typically, to the government - to establish by a preponderance of the evidence that the evidence sought to be suppressed is admissible. Id.

6

### A. *The Initial Stop and Subsequent Arrest of Mr. Matthews*

An officer may conduct a brief investigatory stop based on reasonable suspicion, arising from articulable facts, that the suspect has committed a crime. See United States v. Coker, 223 Fed. Appx. 136, 139 (3d Cir. 2007) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). A police officer may not stop someone merely because that person "looked suspicious." Brown v. Texas, 443 U.S. 47, 52 (1979). The stop must be based on something more substantial than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27.

Courts use a "totality of the circumstances" test to determine if reasonable suspicion existed at the time of a particular police encounter. "The test is one of reasonableness given the totality of the circumstances, which can include [the defendant's] location, a history of crime in the area, [the defendant's] nervous behavior and evasiveness, and [an officer's] 'common sense judgments and inferences about human behavior.'" Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (quoting Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000)). A court may also consider the temporal and geographic proximity of the suspect to a crime scene and the similarity between the suspect's physical appearance and the details of the reported descriptions of the suspect. See United States v. Harple, 202 F.3d 194, 196-97 (3d Cir. 1999).

Mr. Matthews argues that the totality of the facts available to the police officers when they stopped him did not give rise to a reasonable, articulable suspicion that he was engaged in criminal activity. In support of his argument, he relies on, among other things, police radio transmissions recorded at the time of the incident. At one point in these recordings, the officers are overheard saying that "there might be another guy [later identified as Mr. Matthews] at the corner with a hat on and a green and tan jacket that might be involved with [Mr. Anderson]; he's

7

walking toward us now." And at another point in the recordings, the officers state, "Um, we're just trying to stop this before it happens, if it's them." Based on this evidence, Mr. Matthews argues that he was seized simply because he looked suspicious.

The Court disagrees. When the officers arrived at the scene, they observed Mr. Matthews walking away from a car matching the description of the car that Ms. Nance believed had been used to case the check cashing store over recent days. The officers subsequently discovered that the car had a stolen license plate, enhancing their suspicions. The officers also observed Mr. Matthews engaging in odd behavior. Mr. Matthews appeared to be having a cellular telephone conversation with the operator of the car, Mr. Anderson, who was looking at Mr. Matthews through the back window of the car, and vice versa. Moreover, of apparent significance to the officers, although Mr. Matthews was standing at the bus stop on the corner of the street, and was not in front of the check cashing store, Mr. Matthews was not looking in the direction of oncoming buses as would be expected of someone actually awaiting a bus.

Thus, Officers Storm, Frisco, and Pomeroy have described their ample and reasonable suspicion to detain Mr. Matthews,[1] especially given that his actions were consistent with Ms. Nance's report of two males in a gold car casing the check cashing store at around opening time. See United States v. Goodrich, 450 F.3d 552, 561 (3d Cir. 2006) (noting that geographical and temporal proximity of the stop to the scene of the alleged crime militate strongly in favor of the validity of the stop). Because the Terry stop of Mr. Matthews was valid, Mr. Matthews' suppression challenge on that ground must fail. Further, the valid Terry stop properly escalated

---

[1] It is undisputed that when the officers stopped Mr. Matthews, he was detained and "seized" for Fourth Amendment purposes. (See Hrg. 3/26 N.T. at 105-106, 126; Hrg. 6/15 N.T. at 22.)

to a full arrest after the officers learned of Mr. Matthews' outstanding warrants.  See United States v. Thomas, 524 F.3d 855, 859 (8th Cir. 2008) (holding that law enforcement officers have probable cause to arrest individuals on outstanding warrants on unrelated crimes after conducting a Terry stop); see also Klaucke v. Daly, 595 F.3d 20, 26 (1st Cir. 2010) ("[M]ost circuits have held that an officer does not impermissibly expand the scope of a Terry stop by performing a background and warrant check, even where that search is unrelated to the circumstances that initially drew the officer's attention.").

**B.      *The Search of Mr. Matthews' Backpack***

The Fourth Amendment affords protections against unreasonable searches and seizures of a person's "effects."  U.S. Const. amend. IV.  Because the police officers here did not have a warrant to search Mr. Matthews' backpack, "a warrantless search of a closed [backpack] is an unreasonable search under the Fourth Amendment unless it is justified by one of the recognized exceptions to the warrant requirement."  United States v. Rivera-Padilla, No. 07-4093, 2010 WL 541267, at *2 (3d Cir. 2010).  Those exceptions are addressed below.

**1.      *Search Incident to Arrest***

One exception to the warrant requirement is for searches incident to arrest.  Searches incident to arrest are permitted "to disarm a suspect in order to take him into custody," and "to preserve evidence for later use at trial."  Knowles v. Iowa, 525 U.S. 113, 116 (1998).  "[P]olice may search incident to arrest only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'"  Arizona v. Gant, 129 S.Ct. 1710, 1714 (2009) (citing Chimel v. California, 395 U.S. 752, 763 (1960)).

Here, Officer Pomeroy's search of the backpack was not a valid search incident to arrest.[2] Mr. Matthews was handcuffed and locked in the back of a police car when Officer Pomeroy searched his backpack. (Hrg. 3/26 N.T. at 109; 136; 142; Hrg. 6/15 N.T. at 9.) The doors of the police car could not be opened from the inside, and the car windows were closed. (Hrg. 6/15 N.T. at 24.) From this position, Mr. Matthews could not gain access to the contents of his backpack to harm the police officers or to destroy evidence, and it would not have been reasonable for the officers to imagine Mr. Matthews could do so. Thus, Officer Pomeroy's search of the backpack was not permissible as a search incident to arrest. See Gant, 129 S.Ct. at 1716 (explaining that "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply") (citations omitted).[3]

---

[2] At the suppression hearing, Lt. Healy essentially conceded that on these facts, the search of Mr. Matthews' backpack could not be characterized or justified as a valid search incident to arrest. (Hrg. 6/15 N.T. at 45 ("I don't believe it was search incident to arrest.").)

[3] The Government cites a line of cases that, in certain situations, seem to permit searches incident to arrest even after an arrestee has been handcuffed. All but one of these cases is from outside of the Third Circuit and the one that is from our Court of Appeals is both non-precedential and distinguishable. In United States v. Nigro, 218 Fed. Appx. 153 (3d Cir. 2007), police officers searched the defendant's bag, which was located "directly next" to him when he was arrested. The officers had information that Mr. Nigro was armed when they took the bag from him and opened it at the same time they handcuffed him. The court held that the search "was within both the temporal and geographic limitations necessary for a valid search incident to arrest." Id. at 157. The court noted that the "search was proper, even though Nigro was actually handcuffed when the bag was opened." Id. Mr. Matthews' case is different from Nigro. Unlike the officers in Nigro, the police here did not have information that Mr. Matthews was armed when they searched his backpack, making the safety justification for a search incident to arrest decidedly less compelling here. Further, when Officer Pomeroy searched the backpack, it was not "directly next" to Mr. Matthews at the time he was being handcuffed. Rather, Mr. Matthews had already been arrested, handcuffed, and locked in the back of the police car with no ability to access the backpack when the officers commenced the backpack examination.

## 2. *Inventory Search*

Another exception to the warrant requirement arises from an inventory search conducted pursuant to a standard law enforcement procedure. See Illinois v. Lafayette, 462 U.S. 640, 648 (1983) ("[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures."). Inventory searches are constitutionally permissible to serve "three distinct needs: the protection of the owner's property while it remains in police custody, the protection [of] the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." South Dakota v. Opperman, 428 U.S. 364, 369 (1976) (internal citations omitted). An inventory search must be administered in good faith and must be conducted pursuant to reasonable police regulations. Colorado v. Bertine, 479 U.S. 367, 374 (1987). This requirement is "based on the general principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990).

The Government contends that the search of Mr. Matthews' backpack was performed pursuant to the policy outlined in Philadelphia Police Department Memorandum 99-14. Under this policy, "[w]hen an individual carrying a suitcase, briefcase, footlocker, etc. is arrested, the luggage may be seized. However, the contents of the luggage are generally not within the immediate control of the person arrested and therefore, the luggage can only be opened pursuant to the guidelines set forth below."[4] Memorandum 99-14, at p. 1. The subsequent guidelines

---

[4] Memorandum 99-14 also provides that "[t]he search of personal property immediately associated with the person of the defendant does not require a search warrant. (Example: Wallets, pocketbooks, etc.)." Arguably, a backpack could be characterized as personal property

11

require that if the police officer believes that the luggage contains contraband, it should not be opened without a search warrant. Memorandum 99-14, Section III. A. However, if the police officer has no reason to believe that the luggage contains contraband or evidence, the luggage should be "opened and inventoried in the presence of the person from whom it was seized" and "[t]he contents will be itemized on the Property Receipt." Memorandum 99-14, Section III. C.

Officer Pomeroy testified that she opened the bag in Mr. Matthews' presence for safety reasons and so that he could see what the police were taking from him. Officer Pomeroy further testified that, as a matter of general practice, she always opens the personal belongings of an arrestee at the scene. If she did not open the bag at the scene of the arrest, she testified that she believed she could be reprimanded if it were later found that the bag contained weapons or contraband, neither of which are permitted to come into the police station in an unsecured condition for safety reasons. (Hrg. 6/15 N.T. at 17.) Officer Pomeroy was familiar with Memorandum 99-14, and testified that because she had no reason to believe that Mr. Matthews' backpack contained contraband or evidence, she was operating under Section III. C of the Memorandum when she opened it on the scene of the arrest of Mr. Matthews. (Hrg. 6/15 N.T. at 26; 30.)

Philadelphia Police Lieutenant Francis Healy also testified at the suppression hearing regarding the police department's inventory procedures. Lt. Healy has worked at the police department for 20 years. He began his career as a police officer, pursued and achieved a law degree, and eventually became special counsel to the police commissioner in 1999, a position he

---

immediately associated with a person and serving the same purpose as a wallet or pocketbook. The parties, however, agree that a backpack is more akin to a piece of luggage and, hence, properly treated in accordance with the procedure designated for such items.

still holds today. (Hrg. 6/15 N.T. at 33.) His job responsibilities include analyzing, formulating, and implementing police policies and procedures. Lt. Healy was familiar with Memorandum 99-14, though he could not recall if he had been directly involved in drafting it. Lt. Healy testified that when an arresting officer takes personal property that the officer does not believe contains contraband, the bag should be opened and inventoried pursuant to Memorandum 99-14 before it is brought into the station house. (Hrg. 6/15 N.T. at 37-8.) He explained that this inventory search is done for two reasons: first, to keep officers safe by preventing the transportation of any hazardous materials to the police station; and second, to protect the officers from litigation arising from allegations that an arrestee's property was stolen or damaged. (Hrg. 6/15 N.T. at 37-8.)

Mr. Matthews contends that Officer Pomeroy should have followed Section III. A of the policy and procedure Memorandum, which section provides that when an arresting officer has probable cause to believe a suitcase may contain "contraband or fruits or instruments of the crime," the luggage should be seized but not opened without a search warrant. Mr. Matthews argues that the Government seeks, essentially, to have its cake and eat it as well when it argues that the officers had a reasonable suspicion to stop Mr. Mattews, but not probable cause to search Mr. Matthews' backpack, particularly because the backpack was searched after the officers had been informed of the surveillance activities, the officers observed the suspicious activity, discovered the outstanding warrants as to Mr. Matthews, and arrested both Mr. Anderson and Mr. Matthews.

In the final analysis, Mr. Matthews fails to acknowledge that the facts justifying his

arrest are different from those that would justify the initial investigatory stop.[5] Mr. Matthews was *stopped* based on a reasonable suspicion that he was engaged in criminal activity outside of the check cashing store, but he was *arrested* because of outstanding scofflaw warrants. These warrants, which were unrelated to alleged attempted robbery, did not give the officers probable cause to search Mr. Matthews' backpack.

Thus, the Court holds that the Government has proven by a preponderance of the evidence that Officer Pomeroy searched Mr. Matthews' backpack in his presence at the scene of the arrest pursuant to long-standing and clearly articulated Philadelphia Police Department policy on the search and seizure of luggage.[6] There is no evidence that Officer Pomeroy acted in

---

[5] The record has no evidence that the officers observed anything specific outside of the check cashing store that would have given them probable cause to believe that Mr. Matthews' backpack contained contraband or fruits or instruments of a crime. For instance, the police did not observe Mr. Matthews rummaging through his backpack, or removing materials from his backpack that he then used to communicate with Mr. Anderson. Likewise, he did not comport himself in a furtive manner as to the backpack.

[6] Even assuming, *arguendo*, that Officer Pomeroy did not conduct a valid inventory search at the scene of the arrest, the Government also has proven by a preponderance of the evidence that the contents of Mr. Matthews' backpack inevitably would have been discovered when the backpack was inventoried at the police station. The inevitable discovery doctrine permits the introduction at trial of evidence obtained during an illegal search "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." Nix v. Williams, 467 U.S. 431, 447 (1984). The Government can meet this burden by showing, by a preponderance of the evidence, "that the police, following routine procedures, would inevitably have discovered the evidence." United States v. De Reyes, 149 F.3d 192, 195 (3d Cir.1998) (reasoning that "'[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received.'" (internal citation omitted)).

Here, the Government presented evidence that pursuant to the same policy outlined in Philadelphia Police Department Memorandum 99-14, police officers at the police station would have inventoried the contents of Mr. Matthews' backpack for the same reasons: to keep weapons out of the police station and to guard against potential liability for losing an arrestee's possessions. (Hrg. 6/15 N.T. at 38.) Officer Pomeroy explained that when an arrestee arrives at

14

bad faith by conducting this search. Mr. Matthews' Motion to Suppress the contents found in his backpack will be denied.

IV. **CONCLUSION**

For all of the foregoing reasons, Ms. Matthews' Motion to Suppress Physical Evidence is denied.

BY THE COURT:


  /s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

the cell block in the station, the cell block attendant inventories an arrestee's personal property. (Hrg. 6/15 N.T. at 14.) Lt. Healy also testified that if Officer Pomeroy had not opened the bag on the street, "the police officer assigned to the lockup would have ultimately gone through the bag himself." (Hrg. 6/15 N.T. at 43.) Thus, even though a search is done of a personal bag or property on the street, a second search is always done by the cell attendant (Hrg. 6/15 N.T. at 14.) During such a search at the station, the very same contents would have been found and documented. They also would be admissible into evidence at trial.