IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :

    v.                   :  CRIMINAL NO. 09-612

MICHAEL MATTHEWS       :

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Michael Matthews seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the danger that the defendant presents to the community, and the fact that he does not present a medical condition that the CDC identifies as creating a risk of a severe outcome from COVID-19.

## I.    Background

### A.    Criminal Conduct

Defendant Matthews was involved in a conspiracy, along with several others, to rob a check cashing store located at 5300 Tabor Avenue, Philadelphia. A store employee, who saw suspicious behavior by the defendant and his co-conspirators in the days leading up to the planned robbery, contacted police. Police set up surveillance outside the store. On June 12, 2009, police observed defendant Matthews and a co-conspirator approach the store. Matthews was carrying a backpack. Police stopped Matthews for two

outstanding warrants. In Matthews' backpack, police recovered a firearm (Rino Galesi .22 caliber handgun, serial no. 32388), duct tape, and black nylon gloves.

At trial, the co-conspirators testified that defendant Matthews was the impetus for pushing the robbery plan forward. Co-defendant Michael Anderson described that defendant Matthews' plan was, when he saw the employee arrive at the store, to "come up behind her, put the gun to her back, tell her if she ever want [sic] to make it back to 23 Stillman Street [her residence], get in there, turn that alarm off, get that money, put it in the bag and roll out."

Defendant Michael Matthews was convicted by a jury of conspiracy to commit robbery, attempted robbery, carrying and using a firearm during a crime of violence, and possession of a firearm by a felon. He was designated a career offender, due to his prior convictions for robbery and narcotics distribution. The Presentence Investigation Report noted that defendant Matthews suffered from asthma and had trouble breathing. It further noted that he used a "fellow inmate's [asthma pump,] when needed." PSR ¶ 69.

Matthews faced a guideline range of 360 months to life imprisonment, including a five-year mandatory minimum. The Court varied from the guideline range and imposed a sentence of 192 months' imprisonment.

Matthews is serving his sentence at USP Atlanta. His anticipated release date is in three years, on August 7, 2023. Defendant Matthews has been disciplined for many infractions during his time in custody, including possessing drugs/alcohol (2019), refusing to obey order (May 2018), fighting with another person (Apr. 2018), possessing unauthorized item (2018), fighting with another person (Feb. 2018), refusing to obey

order/being insolent to staff member (Feb. 2018), possessing drugs/alcohol (2016), counterfeiting or forging document (2014), being in unauthorized area (2013), threatening bodily harm (2012), assaulting without serious injury (2012), and failing to follow safety regulations (2010). *See* Discipline Record, Exh. A.

### B.    Request for Compassionate Release

On April 21, 2020, Matthews submitted a request for compassionate release to the Warden. The request was based on defendant Matthews' designation as a Care Level 2 inmate for asthma thereby making him a high risk for COVID-19, and the health issues of his daughter.

On July 10, 2020, through his federal public defender, defendant Matthews filed a motion seeking compassionate release based on the purported inability of USP Atlanta to contain the spread of COVID-19, and the numerous staff and inmates that have contracted the virus at the facility, as well as his chronic asthma. Matthews argues that he experiences shortness of breath and uses his albuterol and steroid pumps multiple times per day and fell ill with COVID-like symptoms, though never tested, last March. Matthews further argues that he is needed to care for his children[1] who have behavioral problems, and one of whom suffers a rare cardiac disease.

The undersigned obtained the medical records of the defendant for the past two years from BOP, and are attached here. Exh. B. The records reveal that Matthews, who is 42 years old, has a history of asthma. Most recent, on May 8, 2020, defendant Matthews

---

[1] The oldest child has been placed in a group home.

complained of "chest tightness" and that his current medication was "not helping too much." The medical professional concluded that he did "not appear to be in any respiratory distress at this time." Exh. B, dated 5/8/20. He was prescribed a mometasone furoate inhaler. A month earlier he was prescribed an Albuterol inhaler – "two puffs by mouth twice daily," which he uses "as needed." Exh. B, dated 4/6/20. In late March 2020, he complained of a cough, headache, diarrhea, back pain, body aches, and shortness of breath. The examination revealed that his "[l]ung sounds clear bilaterally . . . ." Exh. B, dated 3/23/20. In December 2019, defendant Matthews complained of flu like symptoms, including a slight cough, chills, and myalgias (muscle ache). He appeared in no acute distress and had no shortness of breath. Exh. B, dated 12/27/19. Earlier in 2019, and in 2018, the records characterize his condition as "mild asthma" and he was given a prescription for an albuterol inhaler.

Mathews' asthma appears well-controlled at this time with medication provided by the institution. The defendant otherwise is fully ambulatory and engages in all normal activities of daily living (ADLs). He does not assert differently in his motion.

### C.  BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate

Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Presently, BOP operations are governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent

possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to

place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, since March 26, BOP has transferred a total of 7,285 inmates to home confinement.[2]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

BOP's aggressive efforts have been successful thus far at USP Atlanta. That facility includes a penitentiary with an adjacent minimum security satellite camp and a detention center, all of which collectively house 1,752 inmates. To date, there have been

---

[2] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

20 reported positive cases; 14 of those inmates have recovered, and the remaining six are isolated while they are treated/recover.

## II.    Discussion

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)   extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18

U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

---

[3] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

(A)     Medical Condition of the Defendant.—

    (i)      The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)     The defendant is—

        (I)      suffering from a serious physical or medical condition,

        (II)     suffering from a serious functional or cognitive impairment, or

        (III)    experiencing deteriorating physical or mental health because of the aging process,

    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     Family Circumstances.—

    (i)      The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii)     The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe,* 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis,* 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The defendant is not eligible for compassionate release, because he does not present an "extraordinary and compelling reason" as stated in the governing guideline policy statement. The defendant does not present any of the health or family circumstances identified in the guideline. The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia,* 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder,* 807 F. App'x 157, 160-61 (3d Cir. 2020) (per curiam) (not precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.* at 161 n.16 ("Similarly, the existence of some

health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").[4]

Defendant Matthews asserts, however, that he does suffer from a condition that is a CDC risk factor in relation to COVID-19. The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. But the defendant presents no such condition.

On July 17, 2020, the CDC, on the basis of extensive available data, revised its list of high-risk factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html? It now reports a list of conditions that

---

[4] *See also, e.g., United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

certainly present a risk, with a much longer separate list for which there is insufficient data to conclude anything other than that these conditions "might" put a person at risk. In the government's view, therefore, inmates with conditions on the latter list do not present an extraordinary basis for relief. Defendant Matthews is not eligible for compassionate release because he has not pointed to any condition that he currently has that is on the CDC's list of high-risk conditions.

Instead, defendant Matthews asserts that he suffers from asthma. The CDC lists "moderate-to-severe" asthma as a condition that "might" pose a risk. Further, it is not clear that Matthews presents even that condition. The U.S. Department of Health and Human Services provides that moderate asthma occurs if, without treatment, any of the following are true:

- Symptoms occur daily;

- Inhaled short-acting asthma medication is used every day;

- Symptoms interfere with daily activities;

- Nighttime symptoms occur more than 1 time a week, but do not happen every night; or

- Lung function tests are abnormal (more than 60% to less than 80% of the expected value).

*Asthma Care Quick Reference Guide*, U.S. Dep't of Health and Human Servs. (Sept. 2012).

The BOP records show that defendant Matthews does not present with moderate asthma; rather, his asthma has been designated as "mild." He has been prescribed two kinds of inhalers – albuterol and mometasone furoate – to use as needed. While he did

seek medical assistance due to "chest tightness" and "shortness of breath," the medical records do not support that he suffered any acute asthmatic episode. To the contrary, the records show that he appeared in "no acute distress." Further, during one recent medical examination, the records showed that his "[l]ung sounds clear bilaterally." There is no indication that defendant Matthews is unable to self-care.

Defendant Matthews therefore presents no "extraordinary and compelling reason" that might justify compassionate release. *See, e.g.*, *United States v. Slone*, 2020 WL 3542196, at * (E.D. Pa. June 30, 2020) (Kearney, J.) (denying compassionate release because inmate had no daily asthma symptoms or daily use of an inhaler, did not have abnormal lung function, and his asthma was mild overall); *United States v. Torres*, 2020 WL 3498156, at *8-9 (E.D. Pa. June 29, 2020) (Kearney, J.) (denying compassionate release where 36-year old defendant's medical records did not show moderate to severe asthma); *United States v. Towel*, 2020 WL 2992528, at *3-4 (E.D. Pa. June 4, 2020) (Sanchez, J.) (denying compassionate release for asthmatic defendant where lung function tests appeared normal, defendant did not need Albuterol inhaler to manage daily asthma symptoms, and he did not experience general shortness of breath); *see also United States v. Mazzo,* 2020 WL 3410819 (D. Conn. June 22, 2020) (extraordinary and compelling reasons do not exist where the defendant has asthma serious enough to require the use of multiple inhalers, but which medical records demonstrate the BOP is managing).

Matthews is 42 years old and has no other medical risk factors. His situation differs from those cases where judges have ordered compassionate release due to asthma when coupled with old age and other serious health issues.

Even if the defendant did present a risk factor, relief should be denied. This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, his medical condition is appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Moreover, he continues to present a danger to the community, and should be required to serve the full sentence that this Court imposed for his criminal conduct. Defendant Matthews carried a gun and gloves and a facemask. He planned to point the gun at the head of a store employee and force her to give him cash. He spent much time devising this plan and working with his co-conspirators. There is no doubt that at the time of his offense, the defendant was engaging in prohibited conduct that presented a significant danger to the community. Also, while in custody, he has not demonstrated that he can follow the necessary rules. He has committed a steady number of infractions that have caused him to repeatedly be formally disciplined.

Matthews' desire to care for his children, given their health and behavioral issues, is commendable. However, his daughter presently resides in a group home, and the children's mother, while she suffers from a heart condition, has been caring for the children since before defendant Matthews was indicted in September 2009. There is no

evidence that the mother is incapacitated. Courts have rejected similar compassionate release claims. *See, e.g., United States v. Sam*, 2020 WL 3415771, at *3 (E.D. La. June 22, 2020) (denying compassionate release where there was no evidence that mother, who contracted COVID-19 twice, was unable to care for the children); *United States v. Richardson*, 2020 WL 2200853, at *2 (E.D.N.C. May 6, 2020) (finding that defendant had not established extraordinary or compelling reasons for a sentence reduction based on his claim that his mother could no longer care for his daughter where there was no evidence submitted directly from the mother or other medical records); *United States v. Goldberg*, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) ("[A] critical consideration in this guidance is that no person other than the defendant is available to serve as a caretaker of a minor or incapacitated immediate family member."). Matthews has not carried his burden of showing his family circumstances warrant compassionate release.

Matthews fails to demonstrate how release three years early reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's managed medical condition, and the amount of time remaining on the defendant's sentence.

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable

outbreak has occurred. *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence for nonviolent drug offense, and has exhibited good behavior); *United States v. Jepsen*, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) ("Mr. Jepsen is in the unique position of having less than eight weeks left to serve on his sentence, he is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19, and the Government consents to his release."); *United States v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020) (31-year-old man is obese and suffers from hypertension and diabetes; four months remaining on sentence); *United States v. Gutman*, 2020 WL 2467435 (D. Md. May 13, 2020) (56-year-old has hypertension and multiple sclerosis; has served four months of six-month sentence for nonviolent offense); *United States v. Sedge*, 2020 WL 2475071 (E.D.N.Y. May 13, 2020) (released with 8 months remaining on 72-month drug sentence, due to "hypertension, hyperlipidemia and coronary artery disease, family medical history, and the rapid rise of COVID-19 infections at FCI Danbury."); *United States v. Rodriguez*, 2020 WL 3051443 (S.D.N.Y. June 8, 2020) (granted due to "psoriatic arthritis, an autoimmune disorder for which he is prescribed an immunosuppressant that weakens his body's ability to fight infections," and asthma; has only seven months left to serve on 60-month term); *United States v. Moore*, 2020 WL 2572529, at *2 (D. Or. May 21, 2020) (inmate with respiratory disease released

with four weeks left in 57-month 922(g) sentence); *United States v. Van Cleave*, 2020 WL 2800769 (W.D. Wash. May 29, 2020) (granted to inmate who suffers from hypothyroidism and sarcoidosis (a rare inflammatory disease that can affect multiple organs of the body, most commonly the lungs), and has less than five months remaining on 20-year sentence); *United States v. Blye*, 2020 WL 3064225 (W.D. Wash. June 9, 2020) (defendant at SeaTac with respiratory issues has only five months to serve for drug offenses; he "has a lengthy and troubling criminal history," but "defendant's past offenses were almost all drug-related and non-violent, and defendant has a near-perfect prison disciplinary record."); *United States v. Kidd*, 2020 WL 3270850 (E.D. Wis. June 17, 2020) (released with two months remaining on one-year sentence for nonviolent theft offense, due to lung ailments and other conditions).

Courts have generally denied release in circumstances comparable to those presented here. *See, e.g.*, *United States v. Miles*, 2020 LW 3256923, at *3 (E.D. Cal. June 16, 2020) ("While defendant presents evidence to support the conclusion his asthma is chronic and something he has lived with since childhood, he does not present evidence or argument his condition is 'moderate to severe.'"); *United States v. Davis*, 2020 WL 2488574, at *4 (C.D. Ill. May 14, 2020) ("Although asthma is a risk factor for COVID-19 complications, Defendant does not allege his condition is particularly severe or not controlled with medication. In fact, Defendant submits he uses an inhaler to manage his asthma symptoms.").

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Denise S. Wolf*
DENISE S. WOLF
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

James J. McHugh, Jr.
Assistant Federal Defendant, Trial Unit


/s Denise S. Wolf
DENISE S. WOLF
Assistant United States Attorney


Dated: August 3, 2020