IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL MATTHEWS | : | No. 09-612-1 |

### MEMORANDUM

PRATTER, J.                                                                                                  AUGUST 31, 2020

Michael Matthews moves for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Matthews claims that his asthma places him at a risk of severe illness from COVID-19 and that his children require his care due to his wife's incapacitation. He seeks release from BOP facility USP Atlanta. The Government responds that extraordinary and compelling reasons do not exist to reduce Mr. Matthews' sentence.

For the reasons that follow, the Court denies the motion.

### BACKGROUND

**I. Mr. Matthews' Criminal Conduct**

Mr. Matthews was involved in a conspiracy to rob a check cashing store in Philadelphia. Police began surveilling the store after an employee observed Mr. Matthews, along with other individuals, exhibiting suspicious behavior. Police later saw Mr. Matthews carrying a backpack and approaching the store with another person. They stopped Mr. Matthews for two outstanding warrants and recovered a handgun, duct tape, and black nylon gloves from Mr. Matthews' backpack.

Witnesses testified at Mr. Matthews' trial that it was Mr. Matthews who had pushed the planned robbery forward. His co-defendant stated that Mr. Matthews had planned to approach the employee when she arrived at the store, hold the handgun to her back, and tell her that if she ever wanted to make it home again she would turn off the store's alarm and get him money from inside.

1

A jury convicted Mr. Matthews of conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, carrying and using a firearm during a crime of violence, and possession of a firearm by a convicted felon. Mr. Matthews was designated a career offender due to prior convictions for robbery and drug distribution. The Court sentenced Mr. Matthews to 192 months of imprisonment to be followed by five years of supervised release. Mr. Matthews' projected release date is August 7, 2023.

While incarcerated, Mr. Matthews has accumulated a disciplinary record that includes assaulting without serious injury, fighting with another person, threatening bodily harm, possessing drugs or alcohol, counterfeiting or forging a document, refusing to obey an order, being in an unauthorized area, and failing to follow safety regulations.

## II. Mr. Matthews' Medical Records

After Mr. Matthews was convicted of the underlying offenses, his presentence investigation report reflected that Mr. Matthews suffered from asthma and had trouble breathing, and that he had used a fellow inmate's asthma pump when needed. His medical records from the BOP for the past two years also reflect a history of asthma.

On May 8, 2020, Mr. Matthews reported at a medical encounter that his current medication was not helping much with his asthma and that he sometimes felt chest tightness. The clinician noted that Mr. Matthews did not appear to be in respiratory distress at the time and could complete sentences without effort. Mr. Matthews was prescribed a mometasone furoate inhaler.

Mr. Matthews had previously been prescribed an albuterol inhaler at earlier encounters. For example, at a January 14, 2019 encounter, Mr. Matthews stated that he was having difficulty breathing at night. The exam notes stated that he had been diagnosed with asthma as a child but his lungs were clear with no wheezing at that time. He was prescribed an albuterol inhaler and instructed to take two puffs a day as needed for his symptoms. Similarly, Mr. Matthews was

prescribed an albuterol inhaler, with the instruction to take it twice daily as needed, at an October 25, 2019 encounter where he was described as having mild asthma and as appearing in no discomfort.

Mr. Matthews reported to an encounter on December 27, 2019 with flu-like symptoms including muscle aches and pains, slight cough, and chills. He was noted as having a history of asthma but no shortness of breath at the time of the encounter. He was instructed to take Tylenol as needed to help with his symptoms.

On March 23, 2020, Mr. Matthews again exhibited flu-like symptoms, including a week-long cough, headache, diarrhea, back pain, shortness of breath at night, and body aches. Mr. Matthews was ordered to isolate in his cell. On April 6, 2020, Mr. Matthews was described as having had coronavirus symptoms two weeks prior. The encounter notes stated that he now felt well without cough, body aches, or fever. The clinician renewed Mr. Matthews' albuterol inhaler prescription.

### III. BOP's Response to the COVID-19 Pandemic[1]

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority,"[2] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited August 25, 2020). The protocol set forth in this plan established a multi-phase framework which requires BOP facilities

---

[1] The Court and many judicial colleagues in this District have received many motions over the past several months which have necessitated a review of past and contemporaneous responses by the BOP to the COVID-19 pandemic. The Court's discussion here reflects the oft-repeated recitation of public information and the most current information concerning applicable conditions.

[2] BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited August 25, 2020).

3

to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i. This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

BOP began planning for potential transmissions related to COVID-19 as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions. Every BOP institution requires all inmates to be secured in their assigned cells/quarters. Limited group gathering, with social distancing to the extent possible, is permitted to facilitate commissary, laundry, showers, telephone, and computer access. BOP is working to distribute face masks to all staff and inmates and encourages face coverings be worn in public spaces when social distancing is not feasible. Excluding medical treatment and similar exigencies, BOP has substantially limited the movement of inmates and detainees among its facilities. Official staff travel has also been cancelled, as has most staff training other than on-line efforts.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with sustained community transmission. Staff members who exhibit a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members with a stuffy or runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may enter BOP facilities. Moreover, all volunteer visits have

been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer entering BOP facilities will be screened for symptoms and risk factors. As of March 13, 2020, social and legal visits were suspended, with facilities permitting only case-by-case accommodations for visiting attorneys after the attorney has been screened for infection. BOP has increased telephone minute allowances to counteract these limits on in-person interactions. Legal visits have subsequently resumed under closely monitored protocols.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). As of the date of this Memorandum, BOP has transferred more than 7,000 inmates to home confinement since March 26, 2020.

Notwithstanding the care taken to reduce risks, some inmates and staff personnel at various BOP institutions have become ill. As of August 3, 2020, the date the Government filed its response in opposition to Mr. Matthews' motion, 20 USP Atlanta inmates had tested positive for the virus. 14 have recovered, and the remaining six are in isolation while they recover and receive treatment.

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d

---

[3] This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[4]

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction and that the reduction is consistent with the Sentencing Commission's applicable policy statements[5] and only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the term. The application note provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially

---

[4] The Government does not raise an exhaustion argument in its opposition.

[5] Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded that "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it also "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.

diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Family circumstances may also constitute an extraordinary and compelling justification where the caregiver of the defendant's minor child or children is incapacitated. U.S.S.G. § 1B1.13, cmt. n.1(C)(i). To find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899) (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)).

## DISCUSSION

Mr. Matthews moves to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), claiming that his asthma increases his risk of serious illness or death from COVID-19. He also asserts that his wife, his minor children's primary caregiver, is incapacitated and his children need him at home to care for their needs.

Before addressing the arguments and the evidence, it once again bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those

diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing,"[6] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Matthews' motion still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and Mr. Matthews' individual circumstances. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify [] release.").

### I. Asthma

Mr. Matthews states that he has suffered from asthma for most of his life, causing him chest tightness and difficulty breathing. He claims that his asthma has gotten worse with age (he is 42 years old), and despite prescribed medical treatments, he still frequently experiences shortness of breath, tightness in his chest, and a burning sensation in his nose. He asserts that he uses prescribed inhalers multiple times every day and night.

---

[6] Some have understandably suggested that this would be better thought of as "physical distancing," insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

8

Mr. Matthews also claims that he had increased difficulty breathing in March 2020 when he experienced a cough, fever, muscle aches, a headache, and diarrhea. His symptoms were described as coronavirus symptoms but he was not tested for COVID-19. He was, however, ordered to isolate in his cell. Mr. Matthews argues that the fact that he experienced physical distress as the result of a possible COVID-19 infection is consistent with his history of asthma.

The CDC has released a list of conditions that place an individual at an increased risk of severe illness from COVID-19. *See* CDC, *People with Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 25, 2020). Asthma is not one of these conditions. Rather, the CDC advises only that moderate to severe asthma *may* increase the risk associated with COVID-19. *See* CDC, *People with Moderate to Severe Asthma*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited August 25, 2020).

Pursuant to the National Asthma Education and Prevention Program, an individual suffers from moderate persistent asthma if any of the following is true:

- Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
- Symptoms interfere with daily activities.
- Nighttime symptoms occur more than 1 time a week, but do not happen every day.
- Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

UNIVERSITY OF MICHIGAN, *Classification of Asthma*, available at https://www.uofmhealth.org/health-library/hw161158 (last visited August 25, 2020).

Mr. Matthews' medical records suggest that he may satisfy at least one of these conditions. However, Mr. Matthews has not exhibited respiratory distress at any of his medical encounters,

9

and his medical providers have responded to his symptoms of chest tightness and difficulty breathing by prescribing both an albuterol inhaler and a mometasone furoate inhaler. Approximately one month after being prescribed the mometasone furoate inhaler, Mr. Matthews reported to a medical encounter on June 11, 2020. He complained of worsening eczema but reported "no other issues" at that time. *See* Opp'n Ex. B at 100 (Doc. No. 169). Despite Mr. Matthews' assertions, the medical record suggests that his asthma is being appropriately treated and managed.

Turning to Mr. Matthews' possible COVID-19 infection, the Court of course has no way of knowing whether Mr. Matthews was in fact infected with COVID-19 in March 2020. However, Mr. Matthews' medical records demonstrate that he even when he did suffer from some telltale symptoms of COVID-19, he did not require serious medical treatment or have any documented resulting severe illness despite his history of asthma.

The Court does not trivialize Mr. Matthews' medical condition, but on this record, the Court concludes that his asthma does not substantially diminish his ability to provide self-care. Accordingly, Mr. Matthews has not demonstrated that his asthma constitutes an extraordinary and compelling circumstance justifying a reduction in sentence. *See United States v. Pomales*, No. 16-826, 2020 WL 4677596, at *2 (S.D.N.Y. Aug. 12, 2020) (concluding that asthma did not constitute an extraordinary and compelling reason to reduce 42-year-old defendant's sentence because "the evidence on this question is 'mixed,' meaning that 'multiple studies . . . reached different conclusions about risk associated' with asthma," and the defendant "has generally been able to manage his condition with his inhaler and other preventative measures [] and he has never been hospitalized or intubated on account of his asthma") (quoting CDC, *Evidence Used to Update the List of Underlying Medical Conditions that Increase a Person's Risk of Severe Illness from*

10

*COVID-19*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited August 25, 2020)).

## II. Family Circumstances

Mr. Matthews also claims that extraordinary and compelling circumstances exist to reduce his sentence because his wife, who is the caregiver of his minor children, is incapacitated. Mr. Matthews has four children: a 23-year-old daughter, a 17-year-old stepson, a 14-year-old daughter, and an 11-year-old son. Mr. Matthews states that his two youngest children have behavioral problems significant enough that they justified a downward variance at his sentencing. He claims that both children also suffer from cardiac disease, and the 14-year-old daughter has chronic, advanced lung disease. Mr. Matthews informs the Court that while he has been incarcerated, the 14-year-old's behavioral issues became severe enough that she now resides in a group home. He claims that this move to a group home was prompted by his wife's inability to provide adequate care due to her own serious heart problems. Mr. Matthews states that his 11-year-old son still lives at home but continues to exhibit behavioral problems, and Mr. Matthews is concerned that his wife's health problems are impeding her ability to adequately care for him.

Mr. Matthews' children are fortunate to have a father who seeks to take an active part in their care and wellbeing. However, it is Mr. Matthews' burden to prove that his children's primary caretaker is incapacitated. There has been no evidence submitted in support of his arguments related to his wife's serious heart condition, her incapacitation, his children's health conditions, or their behavioral problems. *See, e.g.*, *United States v. Richardson*, No. 18-507, 2020 WL 2200853, at *2 (E.D.N.C. May 6, 2020) (finding extraordinary or compelling reasons were not established where "defendant allege[d] his mother c[ould] no longer care for his daughter due to her medical issues, [but] there [wa]s no evidence submitted directly from defendant's mother or other records

11

supporting these assertions"). His wife's medical condition and the children's behavioral problems are described in vague and unspecified terms, and there is no explanation provided as to how and why his wife's condition impedes her ability to care for their 11-year-old son or the extent to which that care has diminished since Mr. Williams was sentenced and incarcerated. Mr. Williams "also fails to explain why he is the only available caregiver for the child in these circumstances." *Id.* In the absence of an evidentiary showing that his minor children's caretaker is in fact incapacitated, the Court cannot grant Mr. Matthews a reduction of his sentence on these grounds.

### III. Factors Under § 3553(a)

Even if the Court did find extraordinary and compelling circumstances warranting a reduction of Mr. Matthews' sentence, the Court must also then take into consideration the § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A). The § 3553(a) factors advise against reducing Mr. Matthews' sentence. Mr. Matthews was convicted by a jury of conspiracy to commit robbery, attempted robbery, carrying and using a firearm during a crime of violence, and possession of a firearm by a convicted felon. These are undeniably serious offenses. Mr. Matthews' sentence of 192 months' imprisonment to be followed by five years of supervised release appropriately reflected that severity as well as promoted respect for the law and protected the public from the dangers of robbery and gun violence.

Mr. Matthews is a designated career offender. He has another three years of incarceration remaining on his sentence. His disciplinary record since being incarcerated includes assault, fighting, and threats. Based on all of these facts, the Court concludes it cannot guarantee that Mr. Matthews' release would not pose a danger to the safety of any person or the community. Accordingly, the Court finds that Mr. Matthews has failed to meet his burden in demonstrating that the Court should reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

## Conclusion

For the foregoing reasons, the Court denies Mr. Matthews' motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

*/s/ Gene E.K. Pratter*

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE